James Kelly for the Appellant Social Technologies. May it please the Court, this is a classic case of David v. Goliath. At the outset I'd like to make this opening for ten minutes, five minutes for rebuttal. Keep an eye on the clock. Very well. Clear-cut case here of Social Technologies compliance with the Lanham Act in connection with the use and commerce requirements under the Act. 5,000 downloads of the Memoji app, strikingly far from the de minimis requirement of the Act, particularly in light of the cases cited in our briefs. Carl Storrs, Endoscopy, New England Duplicating, and Mr. Donut of America and other supporting authorities cited in our briefs that even a sale is not required for finding of use and commerce. And that's before one even considers the 5,500 times the app was downloaded. All the cases cited. Excuse me, were those downloads after Apple showed interest? Well, Social Technologies had been working on this for years before Apple ever painted the picture. Yes, what's the answer to my question? The question of counsel is before or after? It would have been after, apparently. What I'd like to focus on is what happened before Apple got involved and was there continuous attempts to develop and put this into place to actually use it? Or were there gaps? I can't speak to the matter of gaps, Your Honor. Why not? Because the timeline shows that Memoji was in their continuing development well before Apple had expressed an interest. And they had an opportunity during the opposition period to articulate a level of interest, which they failed to do so. In fact, Apple, at one point in time, did, after the opposition period expired, did reach out to a third-party intermediary, to the CEO of Social Technology, who just wasn't interested in selling the rights, trademark rights, to Apple at that time. So describe to me, once they filed for intent to use, describe to me the continuing efforts to put this into actual use. Well, the continuing efforts to put it into actual use, the 5,000 downloads would demonstrate that it had... But that was after. I want to know, from the time they filed with intent to use the mark until Apple showed interest, what were the things they did to show their continuing intent to use this mark? Well, it's compliance with the United States patent and trademark offices, meeting all of those requirements, working with developers, engineers, the coders, that that was an ongoing and continuing in the course of regular business practice. All of those requirements by the Fed were clearly outlined to show that there was not only continuing interest, but desire for this product to enter into commerce. I think what my colleague is asking, and I'm interested in the same thing, is not a colloquy, but a list of things that were done that would show an intent to use in commerce before Apple showed interest. Looking for a list. One, two, three. The mechanics of the engineering, the mechanics of design, of the actual development of an app that was eventually available for download, those were all just software developments. And to say whether ultimately it was ready for prime time without some sort of glitches or snafus, if that were the case, then many of Apple's trademarks, apps that were on Google Play, wouldn't qualify. There was no code written. I thought there was no code until after Apple got involved. I think the fact that it was on, the fact that Lucky Bunny had previously developed something or had the concept of a Memoji which had been abandoned, therefore social technology had picked up the slack, continued with the development of Memoji internally, which eventually was developed into an app ready for download. They had gone through usual processes of R&D, trial and error, and had worked diligently to comply with all the intent of use requirements on the trademarked app. It was the federal agency. It was the federal agency. Council, what should we do? If I may finish, what should we do with the information in the record that suggests what your client was really doing was preparing to sue Apple? And I'm talking about ER 14. The lawsuit is coming together nicely. We're just waiting for the trademark registration to file the lawsuit and get paid. We're lining up all of our information in preparation for a nice lawsuit against Apple Inc. We're looking really good. Get your Lamborghini picked out. What should we make of that? I would say generally, and then I'll get into that specifically, that particular comment. But the trial court seems to have improperly included the applicant's purported motivations into the interpretation of their unemotional law. Incorporating that interpretation of the applicant's motivation essentially goes against the purpose of trademark law, which is to provide consumers assurances regarding where goods originate. And if purity of heart is a requirement, then Apple's founder, Steve Jobs, in the first place, fails big time. The motivation is relevant because part of the test is whether this is a bona fide use or whether it's merely the language in a lot of the cases is whether it's merely to reserve the rights. And isn't the evidence that Judge Hawkins pointed to seems on its face to be strong evidence that what was going on here was not a bona fide use in commerce, but a use purely for the purpose of securing rights so that you could then sue. I'm not sure I see why that wouldn't be relevant. Well, I think that Apple asserting that social technology acted in bad faith by having its developers put features into Memoji app so that the app would conform, again, to the intent to use application is customary within business practice. If the court were to accept that argument, it would be effectively contradicting the ITU application process, which is whole and part and parcel of the Lanham Act. There would be no reason to file an ITU application if the applicant would be open to charges of bad faith for designing his product to conform to the ITU application. Clearly, Apple's argument in that regard is misplaced. Why don't we just assume for the sake of argument that on the day of filing with the PTO that there was an intent to develop the Memoji and put it into commerce? So then the question is, what happened after that? Did they then not continue along that mode? Now, you say they did because they were developing. They didn't have a contract with the developer, but they were developing. I'm interested in the $100,000 investment. You said they made some pitches, but they got the one investment from an employee. Can you explain a little more what was going on there, what their efforts to get investments were, and how the $100,000 came about? The infusion of money in terms of continuing to develop the app, again, goes toward the customary business practice of developing this app to have it in compliance with the federal agency's requirements. The specifics of the R&D and the coding and the technical design engineering elements are all just part of the development of the product itself, the app, or the in-use requirement under the Atlanta Act in the same fashion that Apple separately had undergone some of the same type of design and engineering production internally. Obviously, Apple, with its superior resources and finances, had some course of development, saw a trademark out there, the patent trolls that they are, and made an offer. It was refused because they know there was proprietary right in the mark by social technology and just went ahead and continued to develop Memoji app, which now, if you Google Memoji, Apple's name is written all over it in violation of the trademark. Their attempts to try to invalidate the trademark at this juncture is certainly a greater example of any type of bad faith. Again, they're a Goliath. Could I ask you briefly to address the question of priority, which Apple has raised as an alternative ground for affirmance? Lucky Bunny was using this mark before you were, and they abandoned their application to the PTO, but that's not the same as abandoning use. Given that they were, in fact, continuing to use the mark by selling their app on the App Store, why doesn't that establish that they have priority over you? Apple had an expired trademark application, and during the course of discovery, Lucky Bunny had admitted that they had abandoned the mark and moved on. No, they abandoned the application. That's not the same as abandoning use of the mark, is it? It had expired, Your Honor, and that was the basis for social technology continuing with the ITU application. All of this could easily have been flagged by the United States Patent Trademark Office in the course of that. That's a regulatory agency, and my client has always been in strict compliance. Lucky Bunny abandoned it. Apple seemed to override the USPTO somehow or another in an attempt to try to invalidate this mark in bad faith, we would venture. And we certainly seek to, whatever potential sanctions and attorney's fees, to recover on the back end of this litigation, which we're defending. Or rather, we're attempting to protect our proprietary interests and the mark. You wanted to reserve some time? You're down to about three minutes. I would just state again that instead of offering this whole company's social tech something, Apple just decided to crush my company in litigation. While one can cherry pick the facts to make the appellant's motivations look bad, the true bad actor here is Apple, a joint company content to run roughshod over people whom the law encourages it to negotiate with. Apple has always had options here, which it apparently didn't pursue in good faith in the course of business practice. In short, what about the consumer? The law was crafted to protect consumers, not giant technology companies. Therefore, social technology requests reverse remand to allow social technology to stay in court before a jury. Thank you. Thank you, Counsel. Ms. Zendali? You're muted, Counsel. Thank you for that. I'm Dale Zendali, Counsel for Apple Inc. Good morning, Your Honors. This court should affirm because the Lanham Act is clear that use alone is not enough to secure a trademark registration. Thirty years ago, Congress made the decision to protect the integrity of the trademark system by amending the Lanham Act to make clear that the use necessary to obtain a trademark registration must be bona fide use of the mark in the ordinary course of trade and not merely to reserve a right in the mark. I'm going to list what I think are evidence of a desire to continue developing this mark for commerce, which I couldn't get out of counsel, but I'll list it. I think they got their, they went in, they got their patent, their patent, they got their mark. Then they did some attempts to get investments. They actually got a $100,000 investment through an employee. They were doing some work on developing it, although they didn't have a contract yet with a developer, but they seem to be working on it. They went back to the PTO and got an extension of time to show actual use. They made all those efforts. So we know that we're supposed to look at the totality. So I guess my answer is, why isn't that enough under the pretty low bar in the nice circuit to show a desire to continue to use the mark? For two reasons, Your Honor. First, I'm happy to answer the question you asked my opponent about what the facts were. And I'm happy to also explain why that's not relevant, because the focus of the court should be on the transaction. And let me start with that. The focus of the court is, as the Avakov case, Federal Circuit case that's cited with approval by chance in this court, is that you're supposed to look at the transaction that is the basis for why you're claiming trademark rights and whether it's bona fide. And there, in this case, the transaction to be looked at is whether their launch of this app, as Judge Hawkins said, admittedly, the 36 witness admitted for the purpose of reserving the mark, is bona fide or not. Under that prism, it cannot be bona fide. And let's go back to the facts before then, too. Counsel, excuse me for the interruption, but you're correct. Social technologies could satisfy the burden by doing one of two things. Either actual use in commerce, we've talked a lot about that, or a bona fide intent to use in commerce. And my question to you is, isn't that quintessentially a question of fact, whether someone has made a bona fide attempt? No, Your Honor. And as chance, which was a summary judgment case, showed, they looked at the 35,000 mailings that went out. They looked at the responses to that. But ultimately, the court upheld on summary judgment that this was not bona fide use in commerce because the two sales that it was focusing on were not bona fide. They were token sales. They were made-up sales. And that's the situation here. So, again, looking at the intent, first off, common law use is not a factor here. It's not a situation where someone would have, as was discussed in chance, which was a common law case, this is not a situation where someone was making public common law use and then ultimately led to sales. One, there's nothing they did in the past that was public. And two, more importantly, they have waived any argument with regard to common law use. We move for summary judgment on common law use. They didn't oppose it. They're not appealing it here. So any rights they have are from their trademark application. So now let's look at that. Before you do, aren't you really asking the panel to be a fact finder? No, Your Honor. Excuse me. To look at this record and look at both sides of the arguments and decide whether social technologies actually had a bona fide intent to use in commerce. Now, I will give you that if you left this to me as a trial judge and you were trying a bench trial in front of me, I think I would have no hesitation in ruling for your client. The problem is that this is a question that is almost always left to the trier of fact. Why should we depart from that in this case? It's not almost always, Your Honor, left to the trier of fact as it wasn't in chance, which is the seminal case on this in this district, and it wasn't, it was, bona fide use was decided on summary judgment, the XY Skin case, the S Industries case, the Mountaintop case, cases discussed in our brief at pages 27 to 28. But a principle of summary judgment is that the other side is supposed to come forward with contravailing evidence to support their view of things. And as the district court judge said twice, there wasn't, the evidence points only in one direction. There was a singular focus on securing trademark rights. And that's why this isn't a situation where there's a weighing of evidence. There's an absence of evidence of going to what social tech is arguing. And that's really important, Your Honor, for protecting the integrity of the trademark system. And looking at it again for what they actually did. They filed an application in 2016. They had some business meetings that were failed in mid-2016 that were non-public. So that wasn't even a public kind of use. Then the next thing and the only thing then they did was in January of 2017, they launched two videos that only got a total of 500 views. And then they admitted on deposition that they were asked, why don't you have any documents before Apple's announcement for the whole rest of 2017 and all of 2018? And they said, well, because we weren't working on it. And with regard to the investment from the employee, I think my friend misspoke because the record is that the investment, which we sought documentation on, they said there are no documents supporting it. And it was by the girlfriend of Mr. Bonet, not an employee. No, no engineering was done. So I think I quite frankly, I think it's inappropriate to talk about the relationship between the investor and the founder of the company in this circumstance. But putting that aside, if all of Social Tech's efforts in regard to securing this mark were a sham, why did Apple want to buy it? One, your honor, Apple had already acquired before contacting Social Tech, the rights from the true prior user, which when I'm done with bonafide use, I will, since Judge Miller wanted to talk about it, I will talk about priority and our alternate grounds for, for affirmance. But Apple had already acquired the rights to Lucky Bunny, the prior user. But because in our view, improperly, without disclosing their knowledge of the existence of Lucky Bunny's prior registration, that was still prior use, which was up and running on the Apple store that Mr. Bonet himself admitted shortly before filing his registration, he opened and downloaded. Your argument reminds me of my contracts professor 50 years ago in law school. I took contracts from Harold Haverhurst, who had taken contracts from Williston. And when he would hear an argument like the one you just made, he would revert to his classic Latin and say, a for sure. I mean, the fact that, that Apple already had a deal with Lucky Bunny, why did they then feel that they had to buy up Social Tech's rights? Because your honor, as we said in our brief, because Social Tech had filed its application, it was standing in the way of being able to perfect the Lucky Bunny application. Lucky Bunny had filed a second trademark application when its first application was deemed abandoned. It had filed a statement of use with the trademark office that it had actually used the mark in connection with its software. It didn't get its original registration because it also said it intended to use it for hats and T-shirts. Because it didn't do that, the whole registration was deemed abandoned. But in 2017, it filed a new one, still dating back to the 2014 use date, which had remained unchanged. That they continued to be having downloads, you know, 59,000 downloads in 2016 alone. And then, but because Social Tech had swooped in with its application, it had bollocked up the ability for that application to come through. So Apple contacted them and said, do you want to sell whatever rights you have? They said no. And Apple said, well, I don't need them because I have Lucky Bunny. They're the prior owner. I have the rights for the person that has the rights. I'm going to go forward. And as the United States Supreme Court said in Campbell v. Acup-Rose, admittedly a fair use case, but a case in which someone had made a similar attempt to, well, maybe I should get a license from you. But the Supreme Court said, don't hold that against someone because it's good to reach out and maybe avoid the cost of litigation by coming to a friendly deal. So while the record may suggest that all of Social Tech's activities were intended to build up the case to sue Apple, it's equally possible that Apple's attempt to buy them was an attempt to avoid litigation. Isn't that correct? Well, Apple's attempt to buy whatever rights they had would be an effort to avoid litigation. Absolutely right, Your Honor. And that, from your point of view, is good. But the fact that Social Tech was building up to file a lawsuit affirmatively against Apple, that's bad. Well, it is bad, Your Honor. And it's not just me that says so, but if you look at La Societe and Chance, there's always an interest on the part of someone trying to claim trademark rights. They usually have some hope of having some business activity with regard to it. And I commend the court in particular. I realize it's the district court decision, but the Adidas case involving Reeboks is very similar factually. No document showing at the time of the activity any intent to have any business use. All the documents are about let's engage in these machinations in order to obtain, to continue our trademark registration. And the court found that was not bona fide use in commerce. And the same here. As I only have two minutes left, I'd like to... I'm going to ask a question. I still want to get this straightened out. In order for you to succeed, do you have to show that at the very time they got their original social technologies put in their application, that at that time they had no intent to use? No. The prism is what their... It's not even their intent, Your Honor. It's their conduct. Was the conduct that they were using to get their trademark application perfected in 2018 ordinary use in commerce? Or with it meeting a genuine commercial transaction? Or was it merely to reserve rights in the mark, which they've admitted? They got the application in. They then did a few things. Then you say there was a gap. But under the Lanham Act, they have a certain amount of time to do actual use. And they met the deadlines of the PTO. So are you hanging this on that period in 2017 where they didn't do much? They had time, according to the PTO. You're right, Your Honor. They did have time. What I'm hanging on it is what they did by own admission in 2018 was not an ordinary course of business. It wasn't a bona fide commercial transaction. As their own emails showed out of their own words, it was just to reserve rights in the mark, sue Apple and forget Lamborghinis. And again, as I see my time is ticking, I did want to just say one thing. We don't think you need to reach, obviously, the alternate grounds for affirmance. But if you did, the easiest one to reach, because it's a slam dunk from our position on the undisputed facts, as this court's electrosource case holds, is that Lucky Bunny had rights from 2014 that continued with sales and downloads up until Apple acquired their rights right through 2018. You don't even need to get to issues of whether they had intended to resume or the burden that social tech would have to show abandonment. Because there was never a cessation of use. If we agree with you on that, if we agree with you on just that priority point, what does that mean for the judgment? Because that by itself doesn't get you a cancellation of social technology's mark, does it? No, it doesn't. So it gives you a somewhat narrower judgment, right? It doesn't get us cancellation of social tech's mark, but it's effectively the same thing in the sense that under the, and we cite this in our brief, under the Lanham Act, even if you hold a valid trademark registration, which we don't think they do, but even if you did, that has to take, it's not good against a valid user with priority before you. So if you come along and you get a registration, but actually there's someone with earlier rights than you, you can't enforce it against that person, and thus you lose your case. Thank you, counsel. Thank you. Mr. Kelly? A bit of throat clearing here because, wow, quite honestly, the Apple's counsel, it seems to be so entirely disingenuous to impose whatever extraordinary burden there is to make a showing by social technology on issues of fact as has been cited by this court. Counsel, I mean, I don't think it's helpful to impugn opposing counsel personally, so why don't you just tell us what the argument is? Well, I was said that I wasn't answering the question, and the R&D, what was happening during this course of time was just R&D development, coding. I'm not a software engineer, but he's a sophisticated party by social technology here, and I think it's just the lack of deference to the USPTOs allowing this mark. And now the related attempts to have it invalidated unilaterally, a large company versus a very small company that to its hard work and ingenuity, working for years prior to Apple entering the picture, and perhaps only by virtue of the fact that it was some form of patent trolling or trademark trolling here. We have clear issues of fact here, wonderful questions here by the court here about what was happening, and this is all now prepared for trial on several different issues, but as far as the Lanham Act, as a matter of law, the downloads speak for themselves as having been sufficient as a good in commerce. Regardless of whatever sales aspect or monetizing money may be on the back end, and as for bad faith, it would seem to me that's like the pot calling the kettle black here, and honestly I don't think there's really any shades of gray with regards to social technologies. Reminiscent of the Kentucky Derby, it's like a horse race trying to get to the finish line, and now after the fact, after the social technologies trademark has been perfected, it seems like there's now questions of, well, the winning horse was doping here, it was bad faith, and drawing all sorts of questions upon my client. Thank you very much. Thank you both counsel, and the case just argued is submitted. You'll hear our argument next this morning, our last today, Jones against National Railroad Passenger Corporation.
judges: Hawkins, Restani, Miller